## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS,
## SPRINGFIELD DIVISION

EDUARDO ROBINSON,          )
                           )
              Plaintiff,   )
                           )
       v.                  )        No. 17-cv-3083
                           )
NANCY A. BERRYHILL, Acting )
Commissioner of Social Security, )
                           )
              Defendant.   )

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Eduardo Robinson appeals from the denial of his application

for Social Security Disability Insurance Benefits (DIB) under Title II and

Supplemental Security Income (SSI) under Title XVI of the Social Security

Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and

1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and

1383(c). Robinson filed a Brief in Support of Motion for Summary Judgment

(d/e 11).  The Defendant Commissioner filed a Motion for Summary

Affirmance (d/e 13).  This matter is before this Court for a Report and

Recommendation.  For the reasons set forth below, this Court recommends

that the Decision of the Commissioner should be affirmed.

STATEMENT OF FACTS

Robinson was born on September 5, 1965.  He graduated from high school.  He previously worked as an unarmed roving security guard at a casino.  He last worked as a cook in February 2011.  Robinson filed his applications for Disability Benefits on September 14, 2012.  Robinson suffered from degenerative disc disease, obesity, and major depressive disorder.  Robinson also had a history of Graves disease post-thyroidectomy.  R. 11, 34, 36, 197-207, 232.[1]

On June 2, 2012, Robinson saw Dr. Lance Real, D.O., for a follow up on a visit to the emergency room. He went to the emergency room the night before with bronchitis.  Robinson complained of significant fatigue. Robinson had previously been diagnosed with hyperthyroidism.  Dr. Real noted possible Graves disease.  He referred Robinson to an endocrinology specialist.  R. 565-66.

On August 30, 2012, Robinson saw Dr. Hammad Hussain, M.D., for a follow up examination for Graves disease.  R. 550-52.  Robinson reported dysphagia, palpitations, cough, tremors, diarrhea, and increased sweating. Over the previous two years, he lost more than 100 pounds.  On

---

[1] Robinson does not present any developed argument before this Court regarding the ALJ's determinations regarding his functional limitations caused by his depression.  The issue, therefore, is waived.  See Bodenstab v. County of Cook, 569 F.3d 651, 658 (7th Cir. 2009).  Hence, the Court does not discuss the evidence or the ALJ's analysis of Robinson's mental impairments.

examination, Robinson was 70 inches tall and weighed 216 pounds. Dr. Hussain recommended surgery to remove his thyroid gland. Robinson agreed. R. 552.

On December 11, 2012, Dr. Christian Zwick, D.O., performed a surgical thyroidectomy on Robinson. The pathology report stated that the thyroid showed no evidence of malignancy. R. 548, 321-30, 590.

On February 2, 2013, Robinson saw state agency physician Dr. Raymond Leung, M.D., for a consultative examination. R. 337-43. Dr. Leung noted Robinson's history of Graves disease and a thyroidectomy. Dr. Leung also noted that Robinson had an irregular heart rhythm. Robinson reported occasional palpitations and shortness of breath. Robinson said that he could walk three blocks and lift a maximum of 20 pounds. R. 337.

On examination, Robinson was 70 1/8 inches tall and weighed 228 pounds. Robinson had regular heart rate and rhythm. His gait was slightly slow. He walked 50 feet unassisted. He tandem walked, hopped, heel walked, and toe walked. Robinson could squat. Straight leg raising was 60 degrees for the right leg and 40 degrees for the left. He had decreased range of motion in the spine with flexion limited to 10 degrees. Dr. Leung observed no muscle spasms or atrophy. Robinson's pinch, arm, and grip

strength was 5/5, and his leg strength was 4+/5.  Robinson had no difficulties getting on and off the examination table.  R. 338-39.  Dr. Leung's impression was Graves disease status post thyroidectomy, irregular heartbeat (but normal at examination), and back pain.  R. 339.

On March 15, 2013, Robinson saw Dr. Real for low back pain. Robinson reported that he had low back pain since 1986.  He reported he suffered an injury in 1986 when he picked up a rock.  He "heard his back go out," but did not seek treatment for six months.  He saw a chiropractor who told him he had a pinched nerve.  He stated that he could not take the pain anymore.  Robinson also reported pain in his neck when turning to the left.  Robinson said he had problems with his voice since the surgery.  He said he could not sing or yell.  On examination, Robinson had pain in his lower lumbar region and SI joint discomfort.  He had full range of motion, and negative straight leg lifting tests bilaterally.  He had some tenderness during rotation and side bending.  Dr. Real prescribed Mobic (meloxicam) (an NSAID analgesic) and ordered x-rays of the cervical and lumbar spine. R. 406.

The x-ray of the cervical spine showed degenerative disc disease at the C3-4 level with some bony neural foramen narrowing on the right.  The x-ray showed no acute fracture.  R. 442.  The lumbar spine x-ray showed

degenerative disc disease at the inferior endplate of L5, but no acute osseous abnormality of the lumbar spine and no fracture.  R. 443.

On April 4, 2013, Robinson saw Dr. Real for back pain, neck pain, and depression.  Robinson said the neck pain started after the thyroid surgery.  Robinson reported that physical therapy did not help.  Robinson said he could hardly bend forward.  Dr. Real was waiting for more physical therapy to be approved.  Robinson still could not talk loudly.  Robinson reported that his wife worked outside the home.  He performed most of the childcare, cooking, and cleaning.  Robinson felt depressed.  He felt "somewhat overwhelmed by the household duties, does not feel he is able to get away from some of these duties."  Robinson was not taking any medication for his depression.  R. 398.  On examination, Robinson had no radicular symptoms.  Dr. Real encouraged Robinson to stay active and engage in an exercise program.  Dr. Real recommended medication and counseling for the depression.  Robinson wanted to avoid additional medication, but was agreeable to counseling.  Dr. Real stated that the depression could be exacerbating the back pain issues.  He waited on a workup of the back pain until the depression was under better control.  R. 399-400.

In Late May and June 2013, Robinson went through a course of physical therapy.  R. 358-61, 365-73, 378-79. On May 30, 2013, Robinson saw physical therapist Brian Pahlmann.  Robinson reported that he was able to mow his grass with a push mower, stopping twice to rest.  He took about 90 minutes to mow his lawn; he usually took 45 minutes to mow his lawn without stopping.  The mowing increased his pain.  Palmann noted that Robinson's strengthening and stabilization progressed during therapy. R. 372.

On May 30, 2013, Robinson saw Dr. Zwick for a follow up after his surgery.  Robinson reported voice changes after the surgery.  Robinson reported that he could not sing.  Robinson did not use his voice professionally.  Dr. Zwick noted no dysphagia or swallowing problems.  R. 374.  On examination, Robinson's voice quality was "soft, occasionally breathy."  Dr. Zwick assessed nonspecific voice disturbance.  Dr. Zwick found no medical reason for Robinson's problems with his voice.  R. 375.

On June 24, 2013, Robinson saw physical therapist Pahlmann. Robinson was feeling a little better overall.  He had increased pain and irritation with some exercises.  Robinson had a home exercise program from the therapist. R. 358.

On August 21, 2013, state agency physician Dr. C.A. Gotway, M.D., prepared two Physical Residual Functional Capacity Assessments for Robinson. The first covered the period from February 17, 2011 to December 31, 2012.  R. 98-100, 112-14.  The second covered the period after the thyroid surgery from January 1, 2013, to the present.  R. 100, 114. Dr. Gotway opined that before the December 2012 surgery, Robinson could lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday.  Dr. Gotway opined that Robinson could never climb ladders, ropes, or scaffolds; needed to avoid even moderate exposure to extreme cold or heat; and needed to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  R. 98-99, 112-13.

Dr. Gotway opined that after the December 2012 surgery Robinson could lift 50 pounds occasionally and 25 pounds frequently, stand and/or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday.  He opined that Robison had no other physical functional limitations after the thyroid surgery.  R. 100, 114.

On September 16, 2013, Robinson's wife DeAnne Robinson completed a form concerning Robinson's condition.  Robinson reported,

> Physically his back goes out all the time especially when he
> stands for a long period of time.  The other day he walked to

Page **7** of **36**

> end of block and couldn't make it back home he was in so
> much pain and back gave out & wasn't able too (sic).

R. 351. She said he had pain in his back and legs. She said he used "a cane or sticks or anything he can find" to help him walk. She opined he could walk two to three blocks, stand for 15 minutes, and sit for 30 minutes. She opined he could lift 10 pounds with one hand and a maximum of 20 pounds with both hands. She said he could not mow the lawn; and he could wash and dry clothes, but could not pick up the full laundry basket. She said he sat on a stool to move laundry from the washer to the dryer. He also sat to wash dishes. He could not make the bed because he could not bend over. R. 352.

On October 14, 2013, Robinson saw Dr. Real for back pain. Dr. Real reviewed the results of Robison's MRI. The MRI showed disc degeneration—desiccation at L3-4 and L4-5, and a bulge at L5-S1; but no evidence of spinal cord, nerve root or foraminal impingement. Robinson was not interested in pain medication or referral to a pain management clinic. Robinson reported that physical therapy helped, but he injured himself doing some of the exercises. Robinson reported some instability because of the pain. He said he felt like he could fall because of the pain. Robinson said he believed a cane would help with this. Dr. Real provided a

prescription for a cane and a back brace.  Robinson weighed 258 pounds at the appointment.  R. 591.

On December 25, 2013, Dr. Real completed a form entitled Medical Source Statement of Ability to do Work-Related Activities (Physical) (Medical Source Statement).  R. 672-75.  Dr. Real opined that Robinson could lift 50 pounds occasionally and 10 pounds frequently, stand and walk less than two hours in an eight-hour workday, and sit less than two hours in an eight-hour workday.  R. 672.  Dr. Real opined that Robinson needed to change positions every five to 10 minutes while sitting or standing.  Dr. Real opined that a minimum of 15 times in an eight-hour workday Robinson needed to walk around for five to 10 minutes.  He opined that Robinson needed to be able to shift positions at will from sitting to standing or walking.  Dr. Real opined that Robinson needed to lie down at unpredictable intervals during an eight-hour workday.  Dr. Real stated that these limitations were due to "Disc degeneration-desication (sic) L 3-4, and bulge L5-S1."  R. 672.

Dr. Real opined that Robinson could occasionally twist, stoop, crouch, climb stairs, and climb ladders.  Dr. Real opined these limitations were due to the disc degeneration and bulge at L 3-4 and L5-S1.  R. 673.  Dr. Real opined that Robinson could frequently reach, handle, finger, feel,

and push or pull.  Dr. Real stated that the medical findings supporting these limitations were "N/A".  R. 673.  Dr. Real opined that Robinson was also limited in his ability to engage in prolonged kneeling and crawling due to his disc disease.  Dr. Real opined that Robinson would miss more than four days of work a month due to his impairments.  R. 674.  Dr. Real opined that Robinson would be off-task at work 25 percent or more of the time.  Dr. Real opined that Robinson would be off-task every 15 to 30 minutes for a period of 15 to 30 minutes.  R. 675.

On August 18, 2014, Robinson went to see Dr. Real for a follow up visit on a treatment for a rash.  Robinson also continued behavioral health follow up for his depression every two weeks.  He refused medication for his depression.  Dr. Real included in his notes the following "Patient Active Problem List:"

Diagnosis
- Nonspecific abnormal serum enzyme levels
- Congenital anomaly of adrenal gland
- Anxiety state
- Astigmatism
- Low back pain
- Symptoms involving cardiovascular system
- Symptoms involving digestive system
- Voice disturbance
- Cough
- Depressive disorder
- Degeneration of intervertebral disc
- Dysphagia
- Lateral epicondylitis of elbow

- Routine general medical examination at a health care facility
- Exophthalmos
- Functional diarrhea
- Preglaucoma
- Goiter
- Toxic diffuse goiter
- Disorder of eye
- Personal history of other diseases of circulatory system
- Primary focal hyperhidrosis
- Essential hypertension
- Thyrotoxicosis
- Postsurgical hypothyroidism
- Insomnia
- Legal circumstance
- Major depressive disorder, single episode
- Generalized muscle weakness
- Borderline glaucoma with ocular hypertension
- Other specified aftercare following surgery
- Pre-operative cardiovascular examination
- Tear film insufficiency
- Essential tremor
- Idiopathic urticaria
- Vitreous opacity
- Major depressive disorder
- Psychotic disorder

R. 711-12.  On examination, Robinson weighed 268 pounds.  Dr. Real

observed no return of Robinson's urticarial (hives).  Dr. Real stated that he

continued taking the Lisinopril but the rash symptoms did not return.  Dr.

Robinson continued Robinson on the Lisinopril for blood pressure.  R. 711-

13.

On September 11, 2014, Robinson saw Dr. John T. Barabagiovanni

II, D.O., for chronic diarrhea.  R. 714-18.  Robinson reported changes in his

bowel habits for last two years.  Robinson reported one to two loose stools a day, sometimes watery.  Robinson denied any nocturnal symptoms and any blood or mucus in the stools.  Robinson denied any bowel urgency.  He did not experience any weight loss, nausea or vomiting with these symptoms.  He also reported no dysphagia or odynophagia.  R. 714.  Dr. Barabagiovanni's examination of Robinson was normal.  Dr. Barabagiovanni ordered a celiac panel and recommended a colonoscopy and a possible endoscopy.  Dr. Barabagiovanni prescribed over-the-counter antidiarrheal agents until the testing was complete.  R. 718.

On October 13, 2014, Robinson saw Dr. Real for a rash and back pain.  Robinson reported having back pain more frequently.  R. 720.  Dr. Real referred Robinson to pain management.  Dr. Real noted that Robinson declined all medications for his back in the past.  R. 722.

On November 11, 2014, Robinson saw Dr. Hussain's nurse practitioner Melissa Stembridge for a follow up on his Graves disease.  Robinson reported he was taking his thyroid replacement medicine correctly and consistently.  He reported fatigue for the last year.  He reported getting five to six hours a sleep a night.  He reported that his two-year old child often awakened at night.  His thyroid panel was normal.  R. 724.  Stembridge continued his dose of thyroid medicine.  R. 727.

On March 17, 2015, Robinson saw Dr. Real for a three-month visit. Robinson declined medicine for his depression other than benzodiazepine when necessary. He used that medicine sparingly. Robinson's back pain was unchanged. R. 757. Dr. Real found that Robinson's depression symptoms had improved over the long-term but remained relatively stable since last visit. R. 759.

<u>THE EVIDENTIARY HEARING</u>

On August 8, 2015, the Administrative Law Judge (ALJ) conducted an evidentiary hearing in this case. R. 30-73. Robinson appeared with his lawyer, and vocational expert Dr. Roxane Minkus, Ph.D., appeared by telephone. R. 32; <u>see</u> R. 299-301 (Dr. Minkus's curriculum vita). Robinson testified first. Robinson said he was married. He and his wife lived together with six of his children, ranging in ages from three to 23. His eldest child was 33 years old and did not live with them. R. 34-35.

Robinson testified that he previously worked as a roving, unarmed security guard at a casino. He indicated he stood or walked about five hours out of an eight-hour workday. He said he stopped working the security guard job because he was incarcerated in March 2011 due to a domestic situation. R. 36. He was incarcerated 172 days. R. 37. In February 2012, he went back to work at the casino as a cook for a month in

February 2012.  R. 40; see R. 232 (Work History Report showing dates worked as a cook).  Robinson testified that he sweated because of the heat in the kitchen.  He testified that he had to go to the bathroom at work often because he had diarrhea.  One day the cook in charge told him he went to the bathroom too often.  The cook in charge told him that if he continued going to the bathroom so often "we might have to let you go."  In response, Robinson walked off the job in February 2012, and never went back.  R. 40.

Robinson testified that he found out he had Graves disease in February 2011.  Robinson stated that the diarrhea was a symptom of Graves disease.  Robinson said he still experienced diarrhea every day. He said he had diarrhea three to four times a day.  He said he had cramping.  He indicated he had sudden urges that he could not control, "Yes, I have to be around a bathroom.  Otherwise I can't prevent it from happening."  R. 42.  Robinson also said he "perspired profusely" if he was around heat or outside in the sunlight.  R. 42.

Robinson also testified that he had shortness of breath and an irregular heartbeat, "Every day, all the time."  He said that as a result he was fatigued daily.  R. 42.

Robinson said that the thyroid surgery affected his voice.  He testified he lost his voice for a year and a half after the surgery.  He indicated he

used to speak loudly, but not now.  He stated he still could not scream or yell.  He also testified he could no longer sing as he used to.  R. 43.

Robinson said the Graves disease affected his eyes.  He also said he has sensitivity to light.  He claimed his eyes felt gritty constantly and he saw floaters and shadows.  Robinson said he had to use over-the-counter medicine to lubricate his eyes. Robinson indicated he had polyps in his eyes that affected his vision.  R. 44.  Robinson said his shins were numb.  He said he had flaky, itchy, discolored skin on his shins.  Robinson testified this problem with his shins was due to his Graves disease.  R. 45.  He stated the thyroid medicine he now took made him drowsy.  R. 56.

Robinson testified about problems with his back.  Robinson said he had constant pain in his tailbone and slightly above it.  He claimed the pain was getting worse and worse over time.  He described the pain, "It's sort of like someone grabbing a hold of your spine and just squeezing it, and it - - constantly.  And it's prickling like a thousand needles pricking you all at the same time."  R. 45-46.

Robinson said that physical therapy sessions initially helped his back pain.  He was able to walk three blocks.  He said,

And then one day I came in, and I was just totally in pain. I -- it was like I had to start all over, and I wasn't able to do any of the exercises that they had me do. I think - - I 'm  feeling that the guy, when he saw me, he saw that I looked like I was physically

strong, so he decided to experiment with me and have me do --
because every time he would see me, he would say, I have a
new exercise that I that I feel that' s right for you. And he would
experiment and have me doing all these amazing stuff that I
would go home and just collapse from. But he had me feeling
like I was superman for a little bit. And then I started feeling just
awful. I tried to walk from a tavern to another tavern where my
wife was at, and I didn't make it two blocks and my back totally
gave out on me. I had to call her and have her come and pick
me up. And I started using the cane from that point on.

R. 46-47.  Robinson said Dr. Real prescribed a cane for him.  R. 47.[2]

Robinson testified that he had used a cane for two and one-half years.  He

tried a back brace, but the brace was too big and bulky, and made his back

feel worse.  R. 47.

Robinson testified that he used a heating pad four to five hours a day

due to back pain.  He also testified that the heating pad did not alleviate the

pain.  He also used a massage pad in his car while driving.  R. 47.  He said

he recently started taking Tramadol and Tinazidine for his back pain.  He

said he tried other medicine, but they made him groggy.  R. 48. Robinson

said his doctors told him surgery was a possibility, but had only a 40

percent chance of doing any good.  He decided against surgery.  R. 49.

Robinson testified that he had migraine headaches three times a

week.  The headaches usually lasted two to three hours, but have lasted up

---

[2] The court reporter spelled Dr. Real's name "Dr. Lance Grenel [phonetic]."   R. 47.

to 24 hours.  He took ibuprofen for the headaches.  He stated he was
"scared to mix medicines, because I don't know – I don't know what I can
take with what."  R. 49.

Robinson indicated he had not experienced an anxiety attack in a
year.  He said he got hives when he had "real anxiety attacks."  R. 50.
Robinson took alprazolam and Benadryl for anxiety.  R. 50.  He smoked
marijuana for anxiety, but he stopped about six months before the hearing.
R. 56.

Robinson claimed that he had pain in his right elbow and in both
knees.  He said he had tendonitis in his right leg and knee, and his right
elbow.  He said he had pain daily in his elbow.  He stated that his elbow
was always tingling and "numb-ish."  He said he elevated his elbow to
relieve the pain.  Robinson indicated that the pain in his knees "come and
goes."  He said his knees sometimes give out, "And it, like, snaps.  And it
feels like I'm going to fall."  R. 51.

Robinson testified that he could lift 10 to 15 pounds.  He said he
could not bend over because of his back.  He noted bending, squatting,
and stooping were difficult.  He said he could stand for 10 minutes.  He
claimed his back hurt when he stood longer than 10 minutes.  R. 53-54.  He
said his back hurt when he sat in a chair.  He said:

> I have -- I have problems when I stand up.  Right now sitting,
> it's hurting my back right now like I have a heating pad on. And
> then when I stand up, then it just shoots right to that spot. And
> then as I walk, it starts to relax it a little bit, but it still hurts.

R. 54.  He said he spent most of the day in a recliner with his feet elevated.

Elevating his feet helped alleviate the back pain.  R. 54.

Robinson said he cooked at home.  He sat on a stool while cooking.

He said he went shopping.  He held onto the cart.  He said he would start

riding while shopping soon because his pain was getting worse.  He said

he used a heating pad and massager on his back while he drove.  R. 54.

Robinson indicated he could dress himself and take care of himself,

except he had difficulty putting on his socks and shoes.  He also used a

long-handled scrub brush to wash his feet and back.  R. 55.

Vocational expert Dr. Minkus also testified.  She said that Robinson's

job as an unarmed roving security guard was his only past relevant work.

R. 58-59.  The ALJ then asked Dr. Minkus:

> Q All right.  Okay.  Then I need to ask you several hypothetical
> questions.  Let's start with a younger individual under the age of
> 50, twelfth-grade education, past work history that we just
> covered; 20 pounds occasionally, 10 pounds frequently;
> standing and walking a total of six hours in eight, sitting a total
> of six hours in eight; balancing, kneeling, crouching, crawling,
> stooping, ramps and stairs all occasional; no ladders, ropes, or
> scaffolds; reaching, handling, fingering, feeling, pushing, and
> pulling all frequent.  . . .
>        . . . .

. . . Posturals -- balancing, kneeling, crouching, crawling, stooping, ramps and stairs occasional; no ladders, ropes, or scaffolds; reaching, handling, fingering 1  feeling, pushing, and pulling would all be frequent.  Okay.  Environmental -- temperatures 20 degrees and below, 95 degrees and above -- both of those are limited to 30 minutes maximum at a time. Then I'm going to say in terms of pulmonary irritants, no work environment where there would be airborne particulates from things like grinding presses, sanding presses, and so forth. Simple, routine tasks or any semi-skilled tasks that this claimant is already familiar with, but no learning of any new work skills. Let's say no direct interaction with the general public, and interaction with coworkers and supervisors occasional. Starting with that, could such a person do the past work?

R. 59-60.  Dr. Minkus opined that the person could not perform Robinson's past relevant work.  R. 60.  Dr. Minkus opined that such a person could perform other jobs.  She listed representative jobs of cleaner, housekeeper, with 168,000 such jobs nationally and 6,400 in Illinois; bench assembler, with 70,000 such jobs nationally and 2,600 in Illinois; mail clerk with 29,000 such jobs nationally and 1,300 in Illinois.  R. 60-61.

Dr. Minkus opined that if the person had to use a cane to walk, he could not perform the cleaner, housekeeper jobs and the number of mail clerk jobs that the person could perform would be very significantly eroded if not excluded.  She opined that the number of light bench assembler jobs would be eroded by 10 to 20 percent.  R. 62-63.  Dr. Minkus opined that such a person who needed to use a cane could perform other jobs such as surveillance system monitor with 32,000 such jobs nationally and 700 in

Illinois, and bench assembler jobs that would be done at the sedentary level with 30,000 such jobs nationally and 800 in Illinois. R. 63-64.[3] Dr. Minkus opined that an additional limitation to only occasional reaching that involved putting the elbow at 90 degrees would not eliminate any of the jobs listed. R. 65. Extending the elbow further would eliminate jobs except the bench assembler and surveillance system monitor. R. 66. Dr. Minkus said that a person who consistently missed work three days a month could not find work. R. 66. She opined that a person could not work if he was off-task 20 percent of the time. R. 68. She said that taking 15 to 30 minute breaks every 15 to 30 minutes would make the person be off-task far more than 20 percent. R. 72. The hearing concluded after Dr. Minkus's testimony.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued his decision on November 27, 2015. R. 1-24. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If true, Step 2

---

[3] Dr. Minkus mentioned a cashier job classification that would include tollbooth attendants, but concluded that those jobs would not be available because of the need to avoid contact with the public. R. 63-65.

requires the claimant to have a severe impairment.  20 C.F.R. §§
404.1520(c), 416.920(c).  If true, Step 3 requires a determination of
whether the claimant is so severely impaired that he is disabled regardless
of his age, education and work experience.  20 C.F.R. §§ 404.1520(d),
416.920(d).  To meet this requirement at Step 3, the claimant's condition
must meet or be equal to the criteria of one of the impairments specified in
20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§
404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the
ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work
considering his age, education, work experience, and Residual Functional
Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If
the claimant cannot return to his prior work, then Step 5 requires a
determination of whether the claimant is disabled considering his RFC,
age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),
404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of
presenting evidence and proving the issues on the first four steps.  The
Commissioner has the burden on the last step; the Commissioner must
show that, considering the listed factors, the claimant can perform some
type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Robinson met his burden at Steps 1 and 2. Robinson had not engaged in substantial gainful activity since February 17, 2011, and he had severe impairments of degenerative disc disease, obesity, and major depressive disorder.  R. 13.  The ALJ found that Robinson's diarrhea was not severe because the "alleged diarrhea was not based on clinical and diagnostic evidence and therefore is not a 'medically determinable impairment.'"  The ALJ also noted that the medical records did not indicate weight loss or dehydration.  R. 14.  The ALJ found at Step 3 that Robinson's impairments or combination of impairments did not meet or medically equal a Listing.  R. 14-16.

At Step 4, the ALJ determined that Robinson had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to frequently lift 10 pounds and occasionally lift 20 pounds, to sit for a total of 6 hours of an 8-hour workday, to walk/stand for a total of 6 hours in an 8-hour workday. He can occasionally balance, stoop, kneel, crouch, and crawl, and never climb ladders ropes, scaffolds. Further, he can frequently reach, handle, finger, feel, push and pull. Exposure to temperatures 20° and below and 95° and above is limited to 30 minutes at a time. He cannot have concentrated exposure to pulmonary irritants (defined as he needs a work environment with no airborne particulates from e.g., sanding or grinding processes).

He able (sic) to do simple, routine tasks and any other skilled or
semi-skilled tasks he is already familiar with, with no direct
interaction with the general public and only occasional
interaction with co-workers and supervisors.

R. 16.  The ALJ relied on the back x-rays and MRI that showed mild

degenerative disc disease without evidence of disc space narrowing, cord

compression, or nerve root impingement.  The ALJ relied on Dr. Leung's

consultative examination that he could walk unassisted and had normal

sensation and 5/5 strength in his upper extremities and 4+/5 strength in his

lower extremities.  R. 18-19.  The ALJ further stated that "The medical

evidence does not show that a cane was medically prescribed."  R. 19.

The ALJ found that the conservative treatment of his back problem with

therapy, a brace, and limited medication supported the RFC finding. R. 19.

The ALJ also relied on Dr. Gotway's opinion to support the RFC finding, but

found, based on the testimony at the hearing, that Robinson was more

limited than Dr. Gotway opined.  R. 22.

The ALJ gave limited weight to Dr. Real's Medical Source Statement.

The ALJ noted that Dr. Real was not a specialist.  The ALJ stated that Dr.

Real's opinion that Robinson could only stand or walk for 2 hours in an

eight-hour workday was inconsistent with his opinion that every 15 minutes

in an eight-hour workday, Robinson needed to walk around for five to 10

minutes.  The ALJ said that the x-rays and MRI were not consistent with Dr.

Real's opinions.  The ALJ said the Dr. Real's treatment of Robinson was inconsistent with his opinions.  "Dr. Real prescribed physical therapy, but not even pain medication until recently, and then the medication that is prescribed is mild."  R. 19.  The ALJ found that Robinson's statement that he mowed the lawn was inconsistent with Dr. Real's opinions.  The ALJ gave great weight to Dr. Real's opinions on Robinson's postural limitations.  The ALJ found that the objective evidence did not support Dr. Real's opinions that Robinson would need to be "off task, missing work and needing 15-30 minute breaks every 15-30 minutes."  The ALJ said that no medical evidence supported these opinions.  R. 20.

The ALJ also gave little weight to the statement by Robinson's wife DeAnne Robinson.  The ALJ found that the objective medical evidence did not support her opinions and she was not an acceptable medical source "trained to make exacting observations as to date, frequencies, types and degrees of medical signs and symptoms, or the frequency or intensity of moods or mannerisms."  R. 21.

The ALJ summed up his findings regarding Robinson's RFC determination:

> Accordingly, based on a preponderance of the evidence, including but not limited to the objective evidence, the claimant's course of treatment, medication, his level of daily activity, and the medical source statements, as evaluated

above, the undersigned finds that because of his back pain and
aggravation on his joint and spine due to obesity, the claimant
can only frequently lift 10 pounds and occasionally lift 20
pounds, sit for a total of 6 hours of an 8-hour workday and walk
or stand for a total of 6 hours in an 8-hour workday.  Also
because of his back and limitation due to habitus he can only
occasionally balance, stoop, kneel, crouch, crawl, and never
climb ladders ropes or scaffolds.  Because upper extremity use
can tax and aggravate the claimant's spine condition, he can
only frequently reach, handle, finger, feel, push and pull.
Because exposure to temperature extremes can cause
pulmonary symptoms, the claimant's exposure to temperatures
20° and below and 95° and above is limited to 30 minutes at a
time. Because coughing can aggravate back pain, he cannot
have concentrated exposure to pulmonary irritants as defined
above.  Because of difficulty with concentration the claimant is
limited to simple, routine tasks and any other skilled or semi-
skilled tasks he is already familiar with. Because of problems
with social interactions, he can have no direct interaction with
the general public and only occasional interaction with co-
workers and supervisors.

R. 22.

The ALJ found at Step 5 that Robinson could perform a significant

number of jobs that exist in the national economy.[4]   The ALJ relied on the

Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2,

and the testimony of Dr. Minkus that a person with Robinson's age,

education, experience, and RFC could perform the jobs of cleaner,

---

[4] The ALJ did not make a specific finding at Step 4 that Robinson could not perform his past work as a
security guard.  Robinson does not raise this issue on appeal, and so, the issue is waived.  See See
Bodenstab, 569 F.3d at 658.  The ALJ found that Robinson was not disabled at Step 5 so the omission
did not affect the outcome of the decision.

housekeeper; bench assembler and mail clerk.  R. 22-23.  The ALJ concluded that Robinson was not disabled.

Robinson appealed the decision of the ALJ.  On February 14, 2017, the Social Security Administration Appeals Council denied Robinson's request for review.  The decision of the ALJ became the final decision of the Commissioner.  R. 1.  Robinson filed this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Page **26** of 36

Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The decision of the ALJ is supported by substantial evidence.  The x-rays and MRI supported (1) the Step 3 finding that Robinson's back problem did not meet a Listing, and (2) the RFC determination.  The x-rays and the MRI showed no compression of the spinal cord and no nerve root impingement.  These objective medical findings support the ALJ's conclusion that Robinson's back impairment was not as debilitating as Robinson claimed.

After the thyroidectomy, the medical records do not contain findings that Robinson continued to suffer from the symptoms of his Graves disease that impaired work-related functioning, such as uncontrolled diarrhea, weight loss, and fatigue.  Robinson further did not cite to any objective medical evidence that showed he had a heart problem after the surgery.

The opinions of Drs. Leung and Gotway also supported the RFC determination. Dr. Real's opinions on postural limitations and lifting

limitations supported the RFC finding.  The foregoing constituted

substantial evidence to support the ALJ's RFC determination.

Substantial evidence also supported the ALJ's findings at Step 5 that

Robinson could perform a significant number of jobs in the national

economy.  The RFC determination and Dr. Minkus's opinion supported the

ALJ's finding that Robinson could perform the representative job of bench

assembler at the sedentary level at Step 5.  Dr. Minkus opined that 800

sedentary bench assembler jobs existed in Illinois and 30,000 existed

nationally.  R. 64.  The number of jobs is sufficient to meet the

Commissioner's burden at Step 5 to show that the person could perform a

significant number of jobs in the national economy.  See Liskowitz v.

Astrue, 559 F.3d 736, 743 (7th Cir. 2009) (1,000 jobs is enough to be

significant number at Step 5).  Substantial evidence supported the ALJ's

conclusion at Step 5 that Robinson was not disabled.

Robinson argues that the ALJ erred in stating that Robinson's cane

was not prescribed.  Robinson is correct; the statement was error.  Dr. Real

prescribed the cane after Robinson reported that the cane helped him walk.

The Court, however, agrees with the Commissioner that the error was

harmless.  An error is harmless if correction of the error on remand would

not change the result.  See McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir.

2011).  The ALJ's erroneous statement about the cane prescription meets this definition.  Dr. Minkus opined that Robinson could perform the sedentary bench assembler job even if he needed a cane to walk.  R. 63-64.  Thus, even if the ALJ limited Robinson's RFC to jobs in which he could use a cane, the Commissioner still met his burden at Step 5.  The ALJ's error was harmless.

Robinson also argues that the ALJ erred in giving limited weight to Robinson's subjective complaints because those complaints were "wholly supported by the consistency of the complaints, the persistence of his complaints, and the treatments he sought that doctors agreed were warranted."  Robinson Brief, at 8 or 13.[5]  The Court disagrees.  The ALJ found that Robinson's treatment was not consistent with his testimony about the severity of his back pain.  The ALJ found that Dr. Real prescribed conservative treatment for his back pain.  He prescribed physical therapy, a cane, and a brace.  R. 591.  He prescribed Tramadol and a muscle relaxant, which the ALJ found to be not strong medications.  Robinson does not dispute this characterization of these medications.  The conservative treatment of Robinson and the x-rays and MRI that showed a

---

[5] The Robinson Brief does not contain page numbers.  The Court uses the page numbers assigned by the Court's CM/ECF's system.

less severe impairment provided substantial evidence to support the ALJ's conclusion that the medical evidence was not consistent with Robinson's claimed back symptoms.

Robinson argues that the ALJ ignored evidence to explain the conservative treatment.  He argues that the ALJ ignored medical records which showed that he refused more serious pain medication because of his concerns about possible addiction.  The Court disagrees.  Robinson cites five instances in which he declined additional medication.  Robinson Brief, at 11 of 13, citing R. 591, 625, 711, 719, 722, 757.  In four of the six references, Robinson declined additional medication to treat his depression.  R. 625 (no reference to medication, but refused medication for depression on R. 626); R. 711 (refused medication for depression); R. 719 (no reference to medication, but refused additional medication for depression besides occasional benzodiazepine); R. 757 (same as R. 719).  None of those records identified any concern about addiction.

The record at R. 591 showed that on October 13, 2013, Robinson was not interested in pain medication or referral to the pain management clinic. R. 591.  The record at R. 722 showed that on October 13, 2014, Robinson agreed to a referral to a pain management clinic for his back.  Dr. Real noted that Robinson "declined all medication for this in the past."  Dr.

Real did not state that Robinson was afraid of addiction to pain medication. Robinson did not testify at the hearing that he declined medication because he feared addiction.[6]  Robinson's decision not to take pain medication was consistent with the ALJ's determination that his pain symptoms were not as functionally limiting as Robinson claimed.

Robinson further argues that the ALJ ignored medical evidence that Robinson had persistent functionally limiting symptoms of diarrhea and fatigue.  Robinson Brief, at 10 of 13 – 11 of 13.  Robinson's Graves disease caused diarrhea and fatigue in 2011 and 2012.  Robinson argues that the ALJ ignored complaints of diarrhea and fatigue after the surgery.  Robinson relies on an office visit to Dr. Barbagiovanni II on September 11, 2014 as medical evidence that his diarrhea persisted after his thyroidectomy.  R. 714.  Robinson reported to Dr. Barbagiovanni that he had loose stools twice a day, but he did not have bowel urgency, did not have nocturnal symptoms, did not have any weight loss, and did not have any loss of appetite.  R. 714.  Two loose stools a day without any bowel urgency or other complicating symptoms did not prove any functional limitations from diarrhea; if anything, the record would have supported the ALJ's conclusion

---

[6] Robinson testified he was scared to mix medicines because he did not know "what I can take with what". Robinson was concerned about drug interaction, not addiction.  R. 49.

that his diarrhea symptoms were not severe in 2014. This September 11, 2014 office note also contradicted Robinson's testimony at the hearing that he had loose stools three to four times a day, and he had a constant sense of bowel urgency such that he could not be far away from a bathroom at any time. R. 42. Robinson told Dr. Barbagiovanni that he had no bowel urgency. The inconsistency supported the ALJ's findings.

Robinson cited a record in a November 11, 2014, office visit with nurse practitioner Stembridge as evidence of persistent fatigue. R. 724. Robinson Brief, at 11 of 13. Robinson reported to Stembridge he experienced fatigue for a year. He reported only getting five to six hours of sleep a night. He reported that his two-year old daughter often awoke him during the night. R. 724. Fatigue caused by rearing an infant is not a functional limitation caused by a medically determinable impairment. The medical records cited by Robinson do not show a failure by the ALJ to address material information in the record.

Robinson argues that the ALJ erred in failing to give controlling weight to the Medical Source Statement by Dr. Real. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532

Page **32** of **36**

F.3d 606, 608 (7th Cir. 2008).[7]  The ALJ's findings were consistent with Dr.
Real's opinions on Robinson's ability to lift and on Robinson's postural
limitations.

The ALJ rejected Dr. Real's opinions on Robinson's ability to sit,
stand, and walk; and his opinions that Robinson would be "off task, missing
work and needing 15-30 minute breaks every 15-30 minutes."  The ALJ
said that no medical evidence supported these opinions.  R. 20.  The ALJ
rejected the opinions about Robinson's ability to sit, stand, and walk
because the opinions were inconsistent with: (1) Robinson's report that he
walked behind a push mower for 90 minutes with only two breaks, (2) the x-
rays and MRI that showed a less severe impairment to his back, and (3)
the conservative treatment record.  The ALJ also noted that Dr. Real's
opinion that Robinson could only walk two hours a day was internally
inconsistent with Dr. Real's opinion that Robinson had to walk every 15
minutes for five to 10 minutes.  The internal inconsistency and the
inconsistency with other evidence in the record supported the ALJ's

---

[7] The Commissioner amended the regulations regarding the interpretations of medical evidence.  The
amendments, however, apply prospectively to claims filed on or after the amendment's effective date of
March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01,
at 5844-45 (January 18, 2017).  As such, the amendments do not apply here.

decision not to give controlling weight to Dr. Real's opinions about Robinson's ability to sit, stand, and walk.

The ALJ rejected Dr. Real's opinions that Robinson would miss more than four days of work a month, be off-task at work 25 percent or more, and be off-task every 15 to 30 minutes for a period of 15 to 30 minutes because no objective medical evidence supported these opinions. The ALJ is not required to give controlling weight to a treating physician's opinion unless it is supported by medical evidence. 20 C.F.R. § 404.1527(d)(2). Robinson cited no objective medical evidence that supported these opinions. Substantial evidence supported the ALJ's evaluation of Dr. Real's Medical Source Statement.

Robinson argues that the ALJ erred in not addressing all of the laundry list of his diagnoses listed in the record of his office visit with Dr. Real on August 18, 2014, quoted above on pages 10 and 11. The ALJ is not required to mention every piece of evidence as long as he builds a logical bridge from the evidence to his conclusion. See Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010). Robinson cites no evidence to show that all these diagnoses were material or caused functional limitations on his ability to work. Indeed, diagnoses such as "cough", "disorder of eye", "legal circumstance", "other specified aftercare following surgery", and "tear film

insufficiency" are general and non-specific and without foundation in the

record.  The ALJ addressed the diagnoses that materially affected

Robinson's ability to perform work-related functions and built a logical

bridge from the evidence to his conclusions.  The decision not to discuss

each diagnosis on this list was not error.

> Finally, Robinson's counsel states:

> Unfortunately, the quick and inaccurate reading of
> medical records by the white administrative law judges of the
> St. Louis Office of Disability Adjudication and Review happens
> far too frequently when the plaintiff is an African American, has
> a Hispanic name, or in cases such as plaintiff, falls into both
> categories.

Robinson Brief, at 7 of 13.  The Court has carefully reviewed the record,

including the transcript of the hearing and the decision of the ALJ, and finds

no evidence of racial or ethnic bias or animus.  If counsel believed racial or

ethnic bias affected her client's case, she should have made a record to

support the charge.[8]  She did not.  The unsubstantiated claim of racial or

ethnic bias does not provide a basis for reversal.

> THEREFORE THIS COURT RECOMMENDS that the Defendant

Commissioner's Motion for Summary Affirmance (d/e 13) should be

---

[8] If counsel believes Robinson is a victim of racial or ethnic bias, she may also present the matter to the appropriate officials within the Social Security Administration.  See e.g., How to File an Unfair Treatment Complaint Concerning an Administrative Law Judge, https://www.ssa.gov/pubs/EN-05-10071.pdf, viewed January 23, 2018.

ALLOWED, Plaintiff Robinson's Brief in Support of Motion for Summary Judgment (d/e 11) should be DENIED, and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  <u>See</u> <u>Video Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986).  <u>See</u> <u>Local Rule</u> 72.2.

ENTER:   April 9, 2018

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE